T.C. Memo. 2007-58

UNITED STATES TAX COURT

PHILIP T. AND MARY ELLEN CHAPLIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9354-05.                    Filed March 12, 2007.

<u>David R. Andelman</u> and <u>Juliette Galicia Pico</u>, for
petitioners.

<u>Nina P. Ching</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, <u>Judge</u>:  Respondent determined a deficiency in
petitioners' 2001 Federal income tax of $24,185 and an accuracy-
related penalty under section 6662(a) of $4,837.[1]  The issues for

_____

    [1]  All section references are to the Internal Revenue Code,
                                            (continued...)

decision are: (1) Whether petitioners are entitled to deduct legal fees of $84,542 from their adjusted gross income pursuant to section 62(a)(1), or whether petitioners must deduct the legal fees as a miscellaneous itemized deduction under section 67; and (2) whether petitioners are liable for an accuracy-related penalty under section 6662(a).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. At the time they filed their petition, petitioners resided in West Roxbury, Massachusetts.

Philip T. Chaplin (petitioner) is a professional fiduciary, serving as a trustee of trusts and as an executor of estates. Petitioner began his career with Minot, DeBlois & Maddison (MDM) in 1979. Before his employment with MDM, petitioner had no experience with investment management or trust and estate administration.

On October 27, 1983, Rice, Heard & Bigelow, Inc. (RHB), a C corporation incorporated in the Commonwealth of Massachusetts, was formed as a spinoff of MDM. Upon its incorporation, petitioner went to work with RHB and participated in RHB's

---

[1](...continued)
as amended. Amounts are rounded to the nearest dollar.

profit-sharing plan. In 1986, petitioner became a director and shareholder of RHB and purchased stock representing a 5-percent share of RHB. In February 1987, petitioner was elected to RHB's board of directors.

RHB was formed to provide administrative, management, and investment services for fiduciaries and others, to the extent permitted by law. RHB did not have trustee powers, was not a trust company or bank, and was not registered under the Investment Advisers Act of 1940. RHB could not be appointed to serve as a corporate trustee. Instead, individual fiduciaries associated with RHB were named and served as trustees in their individual capacities. As the named trustees, the fiduciaries were the legal owners of trust assets and had sole custody and authority over the trust assets under their care.

Typically, only RHB's shareholders and directors served as named trustees. Before being retained by a client, the fiduciaries provided the prospective client with a fee schedule, a fiduciary services statement, and a copy of the RHB trustees' investment philosophy. If a new client did not like a particular fiduciary, the client could chose from other fiduciaries at RHB. There was an attempt amongst the fiduciaries to equalize their workloads.

The fiduciaries released all trustee's fees paid to them to RHB. RHB decided how to allocate those fees for paying expenses

and providing compensation. RHB paid the fiduciaries a salary and withheld taxes including Social Security. RHB provided the fiduciaries with general business liability insurance, workmen's compensation, unemployment insurance, group life and disability insurance, family health insurance, and subscriptions to professional publications. RHB also provided office space, copiers, computer systems, and administrative support services. RHB paid petitioner's expenses to become a chartered financial analyst and reimbursed petitioner for any work-related travel expenses. RHB also provided petitioner with a company credit card.

RHB expected petitioner and other fiduciaries to keep regular hours and to work every business day. RHB also expected petitioner and other fiduciaries to keep all fiduciaries apprised of what they were doing. All correspondence with clients was circulated among the fiduciaries.

Before petitioner became a shareholder and director of RHB, Neil Rice (Mr. Rice), RHB's president, and Edward Heard (Mr. Heard) served as petitioner's supervisors and mentors. All supervised employees, including petitioner, were reviewed annually by RHB. The reviews were used by RHB to determine any salary increases and bonuses.

Upon his becoming a shareholder and director, petitioner and RHB executed an "employment agreement" on December 11, 1986. The

employment agreement provided in part:

AGREEMENT made * * * between Philip T. Chaplin of Boston, Massachusetts (the "Employee") and Rice, Heard & Bigelow, Inc., a Massachusetts corporation (the "Employer").

In consideration of the Employee's employment by the Employer and the mutual covenants herein set forth, Employer and Employee agree as follows:

1.  DUTIES.  Employer hereby employs Employee actively to engage in the practice of fiduciary management and related duties.  Employee accepts such employment and agrees to perform all such duties of a nature consistent with his training and experience which may be assigned to him by Employer, and, subject always to fiduciary constraints and to the direction and control of the Board of Directors of Employer * * * provided, however, that Employer agrees not to impose upon Employee any duty or restriction in connection with such performance which would cause any violation of fiduciary standards set forth by law or by any governing instrument under which Employee is to function or any other ethical or legal obligation imposed upon the members of the fiduciary profession in jurisdictions in which the Employee shall practice.

2.  TERM.  The employment shall commence as of the date hereof, and shall continue until terminated as hereinafter provided.

*     *     *     *     *     *     *

5.  EXTENT OF SERVICES, OUTSIDE FEES, ETC. Employee shall devote his entire attention and energies diligently and faithfully to Employer's business * * *. Subject to fiduciary constraints, Employer shall determine the specific duties to be performed by the Employee, the means and manner by which those duties shall be performed, and the extent by which those duties shall be performed by other Employees of the Employer. * * *

*     *     *     *     *     *     *

7.  TERMINATION.  This Agreement may be terminated by either party on not less than sixty (60) days prior

> written notice.  Notwithstanding the foregoing, the Employer may terminate this Agreement without prior notice in the event the Employee (i) commits any dishonest or fraudulent act against the Employer; or (ii) willfully fails to perform substantially his duties under this Agreement, other than by reason of his mental or physical disability. * * *

Petitioner and RHB also executed a "stock purchase and restriction agreement" (stock purchase agreement) on December 11, 1986.

Petitioner received a paycheck from RHB every 2 weeks.  In addition to serving as a fiduciary, petitioner provided administrative services to RHB.  However, RHB did not break petitioner's compensation down into payments for fiduciary and nonfiduciary duties.

From 1988 to 1994, RHB's fiduciaries participated in two committees, the investment strategy committee and the investment committee.  During that time, petitioner served as the discussion leader of the investment strategy committee.  The purpose of the investment strategy committee was to discuss market trends and to serve as a forum for the individual fiduciaries to discuss and share opinions about appropriate investments.

The investment committee met weekly to review individual trust accounts.  The investment committee reviewed 20 to 30 trust accounts per week.  All trust accounts were reviewed three times per year on a fixed schedule.  The investment committee was responsible for approving trades made by the fiduciaries while

serving as trustees. If the trades were not immediately approved, the members of the investment committee would consult with other trustees. If the investment committee objected to the trade, the trade would not be placed even if the trustee of that trust objected.

In 1991, Mr. Rice told petitioner that the fiduciaries were expected to follow the majority vote of the investment committee. Petitioner objected to the recommendations of the investment committee to the extent that he believed the recommendations were not in the best interest of a trust of which he was fiduciary or violated his fiduciary duty to exercise independent judgment. This conflict led to the deterioration of the relationship between petitioner and RHB.

In order to prevent the termination of the employment agreement, RHB compelled petitioner to obtain psychiatric counseling in April 1992. RHB paid for the counseling sessions, and it was up to Mr. Rice and the psychiatrist when the sessions would end. Ultimately, petitioner saw the psychiatrist twice a week for 1-1/2 years.

On November 17, 1994, Mr. Rice informed petitioner that RHB would like to exercise the termination provision of the employment agreement and backdate the notice to November 1, 1994, so that it would be effective December 31, 1994. Instead, on November 17, 1994, petitioner delivered a written notice to RHB

that, pursuant to section 7 of the employment agreement, he was terminating the employment agreement. On November 22, 1994, RHB delivered a written notice to petitioner that, pursuant to sections 1 and 7 of the employment agreement, RHB was terminating the employment agreement for cause. Petitioner immediately turned over his office keys and RHB credit card and left the office. When petitioner returned to gather his belongings, he was supervised by another fiduciary who had to approve what petitioner took from the office.

When he left RHB, petitioner took with him the trust accounts for which he served as the sole trustee. Petitioner also took with him trust accounts for which he served as a cotrustee where the other cotrustee determined that it was appropriate to resign. Petitioner resigned from the remainder of the trust accounts for which he served as a cotrustee.

In January 1995, petitioner began working at Woodstock Corp. On October 4, 1999, petitioner joined Foster, Dykema, Cabot & Co. (FDC) as its vice president and portfolio manager. As he had done at RHB, petitioner remitted all trustee's fees to FDC, and FDC paid petitioner a salary. Petitioner worked at FDC during 2001.

On November 21, 1997, petitioner filed suit against RHB in the U.S. District Court for the District of Massachusetts, alleging various Federal and State claims. In 1999, the District

Court dismissed the Federal claims and declined to exercise pendent jurisdiction over the State claims.

On October 20, 1999, petitioner filed a first amended complaint against RHB, Mr. Rice, and Mr. Heard with the Superior Court Division in Norfolk County, Massachusetts, alleging: (1) Breach of contract--termination for refusal to breach duty to trust beneficiaries; (2) breach of contract--violation of 60-day notice of termination provisions; (3) breach of contract--breach of covenant of good faith and fair dealing; (4) wrongful termination in violation of public policy; (5) intentional interference with advantageous relationships; and (6) defamation. In December 2002, the case was settled, RHB agreed to pay petitioner $1,500,000, and all claims and counterclaims were dismissed with prejudice.

Petitioners filed a joint Federal income tax return for 2001. Petitioners reported wages of $218,453, of which $217,549 represented petitioner's salary from FDC. On an attached Schedule C, Profit or Loss From Business, petitioners reported gross income of $173,211, total expenses of $257,753, and a net loss of $84,542. The gross income represented trustee's fees petitioner received while working at FDC. Because petitioner remitted those payments to FDC, he also included the remittances

in his total expenses.[2]  The remainder of the total expenses

($84,542) was attributable to legal fees arising from

petitioner's lawsuit against RHB.

After deducting the business loss from their wages and other

sources of income, petitioners reported adjusted gross income of

$156,763.  Petitioners reported that they were not liable for any

alternative minimum tax (AMT).  After deducting itemized

deductions and exemptions, petitioners reported total tax of

$23,216 and tax withheld of $46,245 and requested a refund of

$23,028.

On February 22, 2005, respondent issued petitioners a notice

of deficiency, determining a deficiency in petitioners' 2001

Federal income tax of $24,185 and an accuracy-related penalty

under section 6662(a) of $4,837.  Respondent determined that

petitioners were not entitled to deduct legal fees of $84,542

from their adjusted gross income as an ordinary and necessary

business expense.  Instead, respondent determined that the legal

fees were an unreimbursed employee expense relating to

---

[2]  Even though petitioner had a similar arrangement with RHB
in that he remitted all trustee's fees to RHB, petitioners did
not report the trustee's fees and remittances in a similar manner
on their 1994 Federal income tax return.  In fact, petitioners
did not report the trustee's fees as income in any manner and did
not attempt to deduct the remittances.  Instead, they reported
only the wages received from RHB as income.  Likewise,
petitioners did not report the trustee's fees received or the
remittances made to Woodstock Corp. from 1995 through 1997.
Petitioners did not begin reporting the trustee's fees and
remittances on a Schedule C until 1998.

petitioner's employment by RHB.  As such, respondent determined that the legal fees were properly deductible as a miscellaneous itemized deduction to the extent the fees exceeded 2 percent of petitioners' adjusted gross income, or $77,180.  Because miscellaneous itemized deductions are not allowable for purposes of the AMT, petitioners' legal fees deduction triggered an AMT liability of $21,082.

In response to the notice of deficiency, petitioners filed their petition with this Court on May 20, 2005.

OPINION

A.  Petitioners' Legal Fees Deduction

The dispute in this case concerns the appropriate treatment of the legal fees petitioners incurred in connection with petitioner's lawsuit against RHB, Mr. Rice, and Mr. Heard. Section 62(a)(1) provides that taxpayers are entitled to deduct from adjusted gross income "The deductions allowed by this chapter * * * which are attributable to a trade or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee."  Thus, legal fees may be deducted from adjusted gross income if the fees are directly related to the taxpayer's trade or business.  See secs. 62(a)(1), 162.  However, if the taxpayer's trade or business is that of being an employee, then the legal fees will be subject to the limitation of section

62(a)(1) and will be treated as a miscellaneous itemized deduction pursuant to section 67.

The parties agree that petitioners are entitled to deduct the legal fees as a trade or business expense under section 162.[3] The parties disagree, however, regarding the nature of petitioner's relationship with RHB and the appropriate treatment of the legal fees deduction. Petitioners argue that petitioner was not an employee of RHB but was engaged in the trade or business of being an independent professional fiduciary. Petitioners assert that the lawsuit arose from petitioner's trade or business of being an independent professional fiduciary, entitling them to deduct the legal fees from their adjusted gross income under section 62(a)(1). Respondent argues petitioner was an employee of RHB, and petitioners must deduct the legal fees as a miscellaneous itemized deduction under section 67 because the legal fees arose from petitioner's employment. See Alexander v.

---

[3] Petitioners argue, under the origin of the claim test, the legal fees are solely attributable to petitioner's fiduciary services and are therefore deductible under sec. 162, citing Guill v. Commissioner, 112 T.C. 325, 328-329 (1999). The origin of the claim test is typically used to determine whether legal fees are deductible under sec. 162(a) (as a trade or business expense) or sec. 212 (as a nonbusiness expense for the production of income), or whether the legal fees are nondeductible personal expenses. See United States v. Gilmore, 372 U.S. 39 (1963); Guill v. Commissioner, supra. The origin of the claim test is inapplicable to this case because the parties agree that the legal fees are deductible under sec. 162(a) as a trade or business expense. Instead, the dispute is over the nature of petitioner's trade or business--whether he was an employee or an "independent professional fiduciary".

IRS, 72 F.3d 938, 944-947 (1st Cir. 1995), affg. T.C. Memo. 1995-51. To determine the appropriate treatment of petitioners' legal fees, we must determine whether petitioner was an employee of RHB before his termination.

Although the income tax treatment of a taxpayer's trade or business expense deductions depends on whether the taxpayer is "[performing] * * * services * * * as an employee", subtitle A of the Internal Revenue Code does not define "employee". Under these circumstances, we apply common law rules to determine whether the taxpayer is an employee. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-325 (1992); Weber v. Commissioner, 103 T.C. 378, 386 (1994), affd. 60 F.3d 1104 (4th Cir. 1995); Hathaway v. Commissioner, T.C. Memo. 1996-389.

Whether an individual is an employee must be determined on the basis of the specific facts and circumstances involved. Profl. & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988); Simpson v. Commissioner, 64 T.C. 974, 984 (1975). Relevant factors include: (1) The degree of control exercised by the principal over the details of the work; (2) the relationship the parties believe they are creating; (3) whether the work is part of the principal's regular business; (4) which party invests in the facilities used in the work; (5) the individual's opportunity for profit or loss; (6) the permanency of the relationship and the

right to discharge; and (7) the provision of benefits typical of those provided to employees. NLRB v. United Ins. Co., 390 U.S. 254, 258-259 (1968); Weber v. Commissioner, supra at 387; Profl. & Executive Leasing, Inc. v. Commissioner, supra at 232. No one factor is determinative; rather, all the incidents of the relationship must be assessed and weighed. NLRB v. United Ins. Co., supra at 258.

1. Degree of Control Exercised by RHB

Although no single factor is dispositive, the test usually considered fundamental is whether the alleged employer has the right to control the activities of the individual whose status is in issue. Weber v. Commissioner, supra at 387; Profl. & Executive Leasing, Inc. v. Commissioner, supra at 232-233. In order for an employer to retain the requisite control over the details of an employee's work, the employer need not stand over the employee and direct every move made by the employee. Weber v. Commissioner, supra at 388; Profl. & Executive Leasing, Inc. v. Commissioner, supra at 234; Simpson v. Commissioner, supra at 985.

The threshold level of control necessary to find employee status is generally lower when applied to professional services than when applied to nonprofessional services. Weber v. Commissioner, supra at 388; James v. Commissioner, 25 T.C. 1296, 1301 (1956). In James v. Commissioner, supra at 1301, this Court

stated:

> The methods by which * * * [professionals] work are prescribed by the techniques and standards of their professions. No layman should dictate to a lawyer how to try a case or to a doctor how to diagnose a disease. Therefore, the control of an employer over the manner in which professional employees shall conduct the duties of their positions must necessarily be more tenuous and general than the control over nonprofessional employees. Yet, despite this absence of direct control over the manner in which * * * [professionals] shall conduct their professional activities, it cannot be doubted that many * * * [professionals] are employees.

Petitioners argue RHB did not have the right to control the means and manner by which petitioner exercised his fiduciary responsibilities. Petitioners assert that petitioner was required by law to exercise his own independent judgment when exercising his fiduciary duties and was subject only to the requirements of law and the terms of the individual trust documents.

It is inherent in the nature of many professions, including petitioner's, that professional employees engaged in such professions are subject to various requirements of law, requirements of independent regulatory bodies, and other fiduciary responsibilities which are beyond the control of their employer. Because a lower standard applies to professionals, the fact petitioner was required by law to exercise independent judgment does not preclude RHB from exercising the requisite

control. See <u>Weber v. Commissioner</u>, <u>supra</u> at 388; <u>James v. Commissioner</u>, <u>supra</u> at 1301.

Many of the facts and circumstances of this case demonstrate RHB exerted control over petitioner. RHB, Mr. Rice, and Mr. Heard supervised petitioner in the performance of his fiduciary duties until he became a shareholder and director, and petitioner was subject to annual review. Section 1 of the employment agreement required petitioner to perform duties as assigned to him by RHB and required him to perform such duties "subject always to fiduciary constraints <u>and to the direction and control of the Board of Directors of [RHB]</u>". (Emphasis added.) RHB required petitioner to keep regular business hours. RHB required petitioner to keep other trustees informed of what he was doing. RHB's investment committee reviewed all trust accounts, including those petitioner managed, three times per year and had to approve trades made by the fiduciaries. If the investment committee objected to the trade, the trade would not be placed even if the trustee of that trust objected. In 1991, Mr. Rice told petitioner that the fiduciaries were expected to follow the majority vote of the investment committee. RHB required petitioner to seek counseling, and Mr. Rice and the psychiatrist determined when the counseling would end.

Petitioner often objected to the control asserted by RHB, and this dispute apparently led to petitioner's termination and

the subsequent lawsuit. Nevertheless, we find RHB exercised the requisite control over petitioner. This factor supports a finding that petitioner was an employee of RHB.

    2.  <u>The Relationship the Parties Believe They Are Creating</u>

Petitioners argue the parties intended to create a hybrid relationship where: (1) The fiduciaries were the principal and RHB was the agent because the fiduciaries paid RHB to provide them with office space, equipment, and administrative services; and (2) to the extent the fiduciaries provided administrative (nonfiduciary) services to RHB, the fiduciaries were employees of RHB. Petitioners conclude that, because the lawsuit arose from the first type of relationship, the legal fees were attributable to his trade or business of being an independent professional fiduciary and were not attributable to petitioner's employment by RHB. Petitioners' argument is not supported by the record.

While petitioner and RHB did not enter into an employment agreement until 1986, the nature of the relationship before 1986 indicates that the parties believed they were creating an employer-employee relationship. Before being hired by MDM, RHB's predecessor, petitioner had no experience serving as a fiduciary. Petitioner received on-the-job training by MDM and RHB. Petitioner was subject to supervision and annual review by RHB and its shareholders and directors. These factors are more consistent with an employer-employee relationship than with

petitioners' position that petitioner was the principal and RHB was the agent.

The employment agreement demonstrates that the parties intended to continue an employer-employee relationship after petitioner became a shareholder. The employment agreement refers to RHB as the employer and petitioner as the employee. The employment agreement provides petitioner "accepts such employment and agrees to perform all such duties of a nature consistent with his training and experience which may be assigned to him by * * * [RHB], and, subject always to fiduciary constraints and to the direction and control of the Board of Directors of * * * [RHB]". The employment agreement also provides that petitioner:

> shall devote his entire attention and energies
> diligently and faithfully to * * * [RHB's] business
> * * *. Subject to fiduciary constraints, * * * [RHB]
> shall determine the specific duties to be performed by
> the * * * [petitioner], the means and manner by which
> those duties shall be performed, and the extent by
> which those duties shall be performed by other
> Employees of * * * [RHB].

The employment agreement does not indicate that the parties intended to establish a hybrid relationship. Instead, the employment agreement indicates the parties intended to establish an employer-employee relationship, particularly in regard to petitioner's performance of his fiduciary services.

This conclusion is supported by the manner in which RHB treated petitioner. As described above, RHB exercised a requisite level of control over petitioner. RHB paid petitioner

a salary, issued biweekly paychecks, and withheld taxes including Social Security. The fact that the salary was not broken down into payments for fiduciary and nonfiduciary services weighs against petitioners' hybrid relationship argument.

This factor supports a finding that petitioner was an employee of RHB.

### 3. Whether the Work Is Part of the Principal's Business

Petitioners argue that RHB was in the business of providing individual fiduciaries with office space, equipment, and administrative services. Petitioners further argue that RHB could not be in the business of providing fiduciary services because it was not licensed to do so.

The parties stipulated and we so found that RHB was formed to provide administrative, management, and investment services for fiduciaries and others, to the extent permitted by law. This does not establish that RHB's business was limited to providing those services to individual fiduciaries. It is clear that RHB was in the business of providing clients with fiduciary services. The fact that RHB as an entity could not render fiduciary services and that it relied on individual fiduciaries to provide those services does not change the nature of its business. Petitioner is a professional fiduciary. His services as such were an integral part of RHB's business. This factor supports a finding that petitioner was an employee of RHB.

4.  Investment in Facilities Used in the Work

RHB provided petitioner with office space, copiers, computer systems, and other equipment.  Petitioners do not argue petitioner made any investment in the facilities or equipment.  Petitioner argues this was "merely part of the arrangement among the RHB trustees, and that was part of the administrative and support services that RHB provided to the individual RHB trustees."  Petitioner argues that the arrangement was entered into by the "individual RHB trustees" to save administrative costs.  Regardless of why the arrangement was entered into, the fact remains that RHB provided all of the facilities, equipment, and administrative services.  This factor supports a finding that petitioner was an employee of RHB.

5.  Petitioner's Opportunity for Profit or Loss

Petitioners argue that "Petitioner's affiliation with RHB greatly enhanced Petitioner's prospects for earning greater trustee's fees vis-a-vis the trustee's fees he would earn if he conducted his trustee business on his own."  Contrary to petitioner's argument, petitioner's opportunity for profit was limited.  Petitioner's salary and bonuses were fixed by RHB, and he was required to remit all trustee's fees to RHB.  While increased productivity could lead to a raise or larger bonuses in the future, petitioner could not directly increase his profit by earning additional trustee's fees.  Petitioner did participate in

RHB's profit-sharing plan.  However, such an arrangement may also be found in employer-employee relationships and does not by itself weigh in favor of petitioners' position.

There is no indication in the record that petitioner would incur any loss if RHB ceased to be profitable.  However, petitioner could be held personally liable if he breached his fiduciary duties to his clients.  In this limited sense, petitioner did bear some risk of loss.

This factor tends to support a finding that petitioner was an employee of RHB, but its significance is mitigated by petitioner's participation in RHB's profit-sharing plan and his potential personal liability.

6.    The Permanency of the Relationship and the Right To Discharge

The permanency of a relationship indicates an employer-employee relationship, while a transitory relationship does not. Levine v. Commissioner, T.C. Memo. 2005-86; Hathaway v. Commissioner, T.C. Memo. 1996-389.  Additionally, the right to discharge a worker and the worker's right to quit at any time indicate an employer-employee relationship.  Levine v. Commissioner, supra.  Under the employment agreement, the relationship between petitioner and RHB was indefinite, subject to the termination provision.  Under the termination provision, RHB had the right to discharge petitioner with 60 days' notice without cause or immediately with cause.  Petitioner had the

right to quit upon giving 60 days' notice.  This factor supports a finding that petitioner was an employee of RHB.

7.  <u>The Provision of Benefits Typical of Those Provided to Employees</u>

RHB trained petitioner.  RHB provided petitioner with general business liability insurance, workmen's compensation, unemployment insurance, group life and disability insurance, family health insurance, and subscriptions to professional publications.  RHB paid for petitioner's expenses to become a chartered financial analyst and reimbursed petitioner for any work-related travel expenses.  RHB also provided petitioner with a company credit card.  These benefits are typical of those an employer provides to an employee.  This factor supports a finding that petitioner was an employee of RHB.

8.  <u>Petitioners' Other Arguments</u>

Petitioners cite <u>Feivor v. Commissioner</u>, T.C. Memo. 1995-107, for the proposition that the fact a taxpayer reports his business expenses on a Schedule C indicates that he is an independent contractor and not an employee.  Petitioners draw the conclusion that, because they reported on a Schedule C the trustee's fees petitioner received and remitted to FDC, petitioner acted as an independent contractor and not an employee in providing fiduciary services.  How petitioners treated the trustee's fees petitioner received and remitted to FDC has no bearing on petitioner's relationship with RHB.  In fact, while

petitioner was employed by RHB, petitioners did not report on a Schedule C the trustee's fees received and remitted to RHB. Instead, petitioners reported only the wages received. Petitioners' argument is without merit.

Petitioners argue Griswold v. Dir. of Div. of Unemployment Comp. & Div. of Employment Sec., 53 N.E.2d 108, 109 (Mass. 1944), and Rev. Rul. 58-5, 1958-1 C.B. 322, establish that petitioner, as a professional fiduciary, will always be treated as being engaged in the trade or business of being a fiduciary and can never be an employee. In Griswold, the Supreme Judicial Court of Massachusetts addressed whether a trustee was the employee of a trust for purposes of Massachusetts unemployment compensation laws. The court stated trustees "are the masters and principals in the business of the trust" and held "trustees are not employees of such a trust." Rev. Rul. 58-5, supra, addressed whether income received by a fiduciary of a decedent's estate should be considered in computing net earnings from self-employment under the Self-Employment Contributions Act of 1954. The revenue ruling states that "Professional fiduciaries will always be treated as being engaged in the trade or business of being fiduciaries, regardless of the assets contained in the estate." Neither Griswold nor Rev. Rul. 58-5, supra, establishes that a professional fiduciary can never be an employee. Both authorities deal with issues different from the issue in this

case--whether petitioner was an employee of RHB for purposes of the income tax provisions of the Internal Revenue Code. Neither authority has any bearing on this case.

9. Conclusion

Despite petitioners' emphasis on petitioner's independent fiduciary obligations, the record overwhelmingly supports a finding that petitioner was an employee of RHB. The legal fees arose from a lawsuit petitioner instituted in response to his termination by RHB. Because the legal fees were directly attributable to petitioner's employment and termination, petitioners may not deduct the legal fees from their adjusted gross income under section 62(a)(1). Instead, the legal fees must be treated as a miscellaneous itemized deduction pursuant to section 67. As a result, we sustain respondent's determination and find a deficiency in petitioners' 2001 Federal income tax of $24,185.

B. Accuracy-Related Penalty Under Section 6662(a)

Respondent determined petitioners are liable for an accuracy-related penalty under section 6662(a) of $4,837. Petitioners argue they are not liable for an accuracy-related penalty because they had substantial authority and a reasonable basis for their position and they reasonably relied upon the advice of a tax professional; and because they are already subject to AMT, it would be unfair to penalize them further.

Section 6662(a) imposes a penalty of 20 percent of the portion of the underpayment to which section 6662 applies.  As relevant to this case, the penalty applies to any portion of the underpayment that is attributable to a substantial understatement of income tax.  Sec. 6662(b)(2).  There is a "substantial understatement of income tax" if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to penalties.  Sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  Once the burden of production is met, the taxpayer must come forward with evidence sufficient to show that the penalty does not apply.  Higbee v. Commissioner, supra at 447.

According to our determination above, the tax required to be shown on petitioners' tax return was $47,512.  Ten percent of that amount is less than $5,000.  Thus, petitioners' understatement is substantial if it exceeds $5,000.  Petitioners reported an income tax liability of $23,216, resulting in an understatement of $24,296.  Respondent has satisfied his burden of production by showing that petitioners' understatement of tax was substantial.

For purposes of determining the accuracy-related penalty, the amount of the understatement is reduced by the portion of the

understatement that was attributable to the tax treatment of an item where: (1) The taxpayer had substantial authority for his position; or (2) the taxpayer had a reasonable basis for his position, and he disclosed the relevant facts affecting that item on his return. Sec. 6662(d)(2)(B). Petitioners argue that, in accordance with Griswold and Rev. Rul. 58-5, supra, they had substantial authority and a reasonable basis for their treatment of the legal fees. As discussed above, neither authority provides support for petitioners' contention that petitioner, as a professional fiduciary, could never be an employee. Likewise, neither authority provides support for petitioners' treatment of the legal fees.

The accuracy-related penalty is not imposed with respect to any portion of an underpayment if the taxpayer can establish he acted with reasonable cause and in good faith. Sec. 6664(c)(1). Reliance upon the advice of a professional may demonstrate a taxpayer acted with reasonable cause and in good faith. Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98-99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991); see sec. 1.6664-4(c)(1), Income Tax Regs. However, a taxpayer's reliance upon the advice of a professional does not automatically constitute reasonable cause. Neonatology Associates, P.A. v. Commissioner, supra at

98-99; see sec. 1.6664-4(c)(1), Income Tax Regs. For a taxpayer to reasonably rely on the advice of a professional, the taxpayer must show: (1) The adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Associates, P.A. v. Commissioner, supra at 98-99.

Petitioners argue they relied on the advice of a tax professional in determining how to treat the legal fees. However, petitioners did not call their tax professional as a witness, nor did they introduce evidence which would allow the Court to evaluate the tax professional's expertise. Because petitioners have not established their tax professional was a competent professional who had sufficient expertise to justify reliance, petitioners have not shown they acted with reasonable cause and in good faith. See sec. 6664(c)(1); Neonatology Associates, P.A. v. Commissioner, supra at 98-99.

Finally, petitioners' argument that they should not be held responsible for the accuracy-related penalty because they are already being penalized by the AMT is without merit. This Court has previously stated:

> The unfortunate consequences of the AMT in various circumstances have been litigated since shortly after the adoption of the AMT. In many different contexts, literal application of the AMT has led to a perceived

hardship, but challenges based on equity have been uniformly rejected. * * *

* * * it "is not a feasible judicial undertaking to achieve global equity in taxation * * *. And if it were a feasible judicial undertaking, it still would not be a proper one, equity in taxation being a political rather than a jural concept." * * * the solution must be with Congress.

Speltz v. Commissioner, 124 T.C. 165, 176 (2005) (quoting Kenseth v. Commissioner, 259 F.3d 881, 885 (7th Cir. 2001), affg. 114 T.C. 399 (2000)), affd. 454 F.3d 782 (8th Cir. 2006); see also Alexander v. IRS, 72 F.3d 938 (1st Cir. 1995); Okin v. Commissioner, 808 F.2d 1338 (9th Cir. 1987), affg. T.C. Memo. 1985-199; Warfield v. Commissioner, 84 T.C. 179 (1985); Huntsberry v. Commissioner, 83 T.C. 742, 747-753 (1984). Petitioners' equity argument offers no relief from the accuracy-related penalty.

For the above-stated reasons, we find petitioners are liable for an accuracy-related penalty under section 6662(a) of $4,837.

In reaching our holdings, we have considered all arguments made, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.