T.C. Summary Opinion 2009-53

UNITED STATES TAX COURT

WALTER N. MAIMON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8008-07S.                    Filed April 20, 2009.

<u>John E. Fulker</u> and <u>Robert A. McCarthy</u>, for petitioner.

<u>Gary R. Shuler, Jr.</u> and <u>Matthew J. Fritz</u>, for respondent.

GOEKE, <u>Judge</u>:  This case is before the Court pursuant to the
provisions of section 7463 of the Internal Revenue Code in effect
at the time the petition was filed.[1]  Pursuant to section
7463(b), the decision to be entered is not reviewable by any

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the year at issue, and
all Rule references are to the Tax Court Rules of Practice and
Procedure, unless otherwise indicated.

other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined an $11,793 Federal income tax deficiency for 2004. The issues for decisions are: (1) Whether petitioner was an independent contractor for 2004 entitled to report income and expenses on a Schedule C, Profit or Loss From Business; and (2) should we determine that petitioner is an employee, whether petitioner is entitled to miscellaneous itemized deductions of $24,615 for 2004.

## Background

The stipulation of facts and the accompanying exhibits are incorporated by this reference. Petitioner resided in Ohio at the time of filing his petition.

Petitioner is a medical doctor and specializes in head and neck surgery, otolaryngology, and facial plastic surgery. During 2004 petitioner provided medical services to patients through Dayton Head and Neck Surgeons, Inc. (DHN). Petitioner's biographical information is listed on DHN's Web site under the Web page designated "Physicians and Professional Staff". Petitioner joined DHN as a shareholder in 1999. Before joining DHN, petitioner was in sole practice for approximately 10 years.

On July 1, 2001, petitioner and seven other doctors executed a shareholders' agreement and close corporation agreement (shareholder agreement) with each doctor an equal shareholder.

The physician shareholders of DHN had different areas of specialty and organized DHN to share overhead and operating expenses and agreed to share revenues equally.  On that same date, petitioner executed an employment agreement with DHN effective until June 30, 2004.  Thereafter, the employment agreement would be automatically renewed for additional 1-year terms unless the employee resigned, died, became disabled, or was terminated by DHN.  The employment agreement expressly identified petitioner as an "employee" of DHN and provided that he agreed to serve as an officer and member of the board of directors.  The terms of the employment agreement provided:

> the Employee shall, under the supervision of the physician members of the Corporation's Board of Directors, devote his working time, skill and experience to advancing and rendering profitable the interests of the Corporation * * *.

The employment agreement placed additional requirements on petitioner relating to:  (1) Maintaining and improving DHN's standing within the community; (2) maintaining telephone service and other appropriate equipment at his residence; (3) attending annual continuing education courses; and (4) maintaining hospital staff privileges.  The employment agreement provided that DHN would reimburse petitioner for the costs of continuing education courses, hospital staff dues, professional societies, professional publications, and other professional expenses in accordance with policies established by the board of directors.

The employment agreement also provided for paid vacation leave for petitioner and required DHN to maintain malpractice insurance on petitioner.

Under the terms of the employment agreement, petitioner agreed that all patients that he treated were regarded as DHN's patients and all records and files, including patient files, were considered the property of DHN. Petitioner further agreed that DHN was entitled to "receive any and all fees arising out of his rendition of medical services." DHN agreed to pay petitioner an annual base salary of $253,000 with increases set by the board of directors. Petitioner's annual base salary in 2004 remained at $253,000. Petitioner was also eligible to receive annual bonuses. The bonus was based on DHN's net annual profits and not on petitioner's individual performance. The employment agreement provided that petitioner would receive the same amount of total annual compensation, consisting of the base salary and bonus, as the other physician shareholders. Finally, under the terms of the employment agreement, petitioner would receive "supplemental bonus compensation" of $30,076 during the period ending December 31, 2004, in consideration of petitioner's senior status with DHN.

During 2001 through 2007 DHN employed receptionists to schedule patient appointments for its doctors, processed insurance claims for patients, billed and collected money from

patients for medical services its doctors and medical staff performed, accepted assignments for all Medicare and Medicaid patients, required new patients to complete paperwork relating to patient information and insurance information, and required returning patients to complete a health history form, including for petitioner and petitioner's patients. By signing the paperwork, the patient authorized DHN: (1) To provide diagnostic and treatment services to the patient; (2) to submit claims to the patient's insurance carrier or its intermediaries for all covered services the doctor rendered and authorized and directed the patient's insurance carrier to issue payment directly to DHN; and (3) to furnish complete information to the patient's insurance carrier or its intermediaries regarding services rendered. DHN provided patients, including petitioner's, with a "Notice of Privacy Practices" and required them to sign a "Privacy Practices Acknowledgement". Petitioner had a personal scheduler assigned to him who scheduled his appointments and surgical procedures. Although petitioner chose this person, the person was paid by DHN. Petitioner managed his patient records and provided billing codes to DHN's billing staff to prepare patient billing statements.

DHN leased real properties where it provided medical services at five office locations in Ohio. In 2004 petitioner saw patients at two of these office locations--in Centerville,

Ohio, and Dayton, Ohio. Petitioner performed surgery at Miami Valley Hospital and Kettering Medical Center. DHN also leased medical, communication, and computer equipment and other fixtures for use at its office locations. In 2004 DHN maintained office hours on Monday through Friday from 8:30 a.m to 5 p.m. Petitioner was required to work nine half-day shifts, or 4-1/2 days, per week during these set office hours. Petitioner could choose his half-day off each week. Petitioner was required to be on call on a rotating basis to accept assignments DHN scheduled at night and on Sundays and holidays. Petitioner could pay another doctor from DHN to take his turn on call. The doctors were not required to see a specific number of patients. The number of patients per hour varied among the doctors and depended in part on the doctor's specialty. Petitioner was paid a prorated portion of his annual salary biweekly and received the same amount of compensation regardless of the number of patients that he saw during the biweekly pay period.

The shareholder and employment agreements provided that DHN had the right to terminate petitioner upon a vote of all, except one, of the shareholders. The agreements did not require DHN to have cause for petitioner's termination. Upon termination, petitioner had the right to a wage continuation payment of $120,000 for past services, subject to certain conditions, in addition to his accrued but unpaid base salary, a prorated annual

bonus, and earned and unpaid balance of the supplemental bonus compensation. The employment agreement required petitioner to give DHN 60 days' notice to terminate his relationship with DHN. Petitioner's failure to give 60 days' notice could result in the forfeiture of his right to payments upon termination.

Petitioner participated in DHN's employee retirement benefit plan. For 2004 DHN made contributions to the plan on petitioner's behalf. Petitioner did not report these contributions as income for 2004. Nor did petitioner report earnings on the account balance as income for 2004. For 2004 petitioner received paid vacation and holidays from DHN. DHN also provided medical insurance and disability insurance to petitioner and paid petitioner's premiums for both policies during 2004. DHN also paid the premiums for petitioner's malpractice liability insurance during 2004.

For 2004 petitioner received a Form W-2, Wage and Tax Statement, from DHN reporting $409,300 in compensation paid to petitioner as "Wages, tips, other compensation" in box 1. DHN did not check the box on the Form W-2 to indicate that petitioner was a statutory employee. In 2004 DHN withheld Federal, State, and local income taxes and Social Security and Medicare taxes from the compensation paid to petitioner. Petitioner did not pay any self-employment taxes for 2004. Petitioner did not receive compensation from any other source during 2004 for providing

medical services, and petitioner did not perform medical services for a fee outside of his relationship with DHN.

For 2004 petitioner filed a Form 1040, U.S. Individual Income Tax Return, and left blank line 7 "Wages, salaries, tips, etc." He attached Schedule C to his 2004 return and reported "physician" as his principal business or profession. On the Schedule C petitioner reported gross receipts or sales of $409,300, the wage amount shown on the Form W-2 DHN issued. He checked the box to incorrectly indicate that the statutory employee box was checked on his Form W-2.

During 2004 petitioner paid legal fees of $22,155 in connection with a lawsuit filed against him, among others, for medical negligence. In 2004 petitioner settled the lawsuit for $1.4 million with his malpractice insurer's agreeing to pay $400,000 and petitioner's agreeing to pay $1 million. Petitioner paid the $1 million settlement during 2005. During 2004 petitioner paid membership dues of $440 to the American College of Surgeons Professional Association. Petitioner reported total expenses of $24,615, consisting of legal fees of $24,175 and professional dues of $440, on the Schedule C.

In September 2006 petitioner requested that DHN issue an amended Form W-2 for 2004. DHN's business manager informed petitioner that the issuance of an amended Form W-2 was not appropriate, and petitioner did not receive the requested amended

Form W-2 from DHN.  For the years 2001 to 2003 and 2005 to 2006 petitioner received Forms W-2 from DHN reporting his compensation as "Wages, tips, other compensation" and the withholding of Federal, State, and local income taxes and Social Security and Medicare taxes.  For 2001 to 2003 petitioner reported the compensation received from DHN on Form 1040, line 7, "Wages, salaries, tips, etc.", on Form 1040 and did not file a Schedule C with his returns.  For 2005 petitioner reported the compensation received from DHN on line 7 "Wages, salaries, tips, etc." and attached a Schedule C to the return.  The Schedule C did not report any gross receipts or sales but claimed expenses of over $1 million, including the $1 million settlement payment for the medical negligence lawsuit.  For 2006 petitioner attached a Schedule C to his return and reported gross receipts and sales of $507,944, which is $50 less than the amount shown as compensation on his Form W-2 from DHN and claimed expenses of $992. Petitioner checked the box on line 1 of the 2006 Schedule C to incorrectly indicate that his Form W-2 identified him as a statutory employee.

## Discussion

Petitioner contends that he is an independent contractor for Federal income tax purposes and is entitled to deduct business expenses on Schedule C.  An individual performing services as an employee may deduct expenses incurred in the performance of

services as an employee as miscellaneous itemized deductions on Schedule A, Itemized Deductions, to the extent the expenses exceed 2 percent of the taxpayer's adjusted gross income.  Secs. 62(a)(2), 63(a), (d), 67(a) and (b), 162(a).  An individual who performs services as an independent contractor is entitled to deduct expenses incurred in the performance of services on Schedule C and is not subject to the 2-percent limitation imposed on miscellaneous itemized deductions.  Although petitioner claimed on his 2004 return that he was a statutory employee, he has acknowledged that he does not qualify as a statutory employee as defined in section 3121(d).

I.   Employment Classification

Respondent contends that petitioner was an employee of DHN because he was an officer of DHN and under the common law definition of employee.  Although petitioner agreed in his employment and shareholder agreements to serve as an officer, petitioner credibly testified that he did not in fact serve as an officer during 2004.  Neither the shareholder nor the employment agreement assigned any official responsibilities to petitioner. Respondent has not identified any such duties assigned to petitioner.  However, a determination of whether petitioner was an officer is not necessary because we find below that he was a common law employee of DHN.

Whether an individual is an employee or an independent contractor is a factual question to which common law principles apply. Weber v. Commissioner, 103 T.C. 378, 386 (1994), affd. 60 F.3d 1104 (4th Cir. 1995). Guidelines for determining the existence of an employment relationship are found in three substantially similar sections of the regulations: Sections 31.3121(d)-1, 31.3306(i)-1, and 31.3401(c)-1, Employment Tax Regs., relating to FICA, FUTA, and income tax withholding, respectively, that adopt the common law definition of an employee. Under the common law, an employer-employee relationship exists when the principal has the right to control and direct the service provider, not only as to the result to be accomplished but also as to the details and means by which that result is accomplished. Secs. 31.3121(d)-1(c)(2), 31.3306(i)-1(b), Employment Tax Regs.; see also sec. 31.3401(c)-1(b), Employment Tax Regs. Factors that are relevant in evaluating whether a worker is a common law employee or an independent contractor include: (1) The degree of control the principal exercised; (2) which party invests in work facilities the worker used; (3) the worker's opportunity for profit or loss; (4) whether the principal can discharge the worker; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believed they were creating. Ewens & Miller, Inc. v.

Commissioner, 117 T.C. 263, 270 (2001); Weber v. Commissioner, supra at 387. All of the facts and circumstance of each case are considered, and no single factor is dispositive. Ewens & Miller, Inc. v. Commissioner, supra at 270.

A. Degree of Control

While no single factor is dispositive, the degree of control the alleged employer exercised over the details of the work is the "crucial test" in determining employment status. Weber v. Commissioner, supra at 387. An employment relationship exists where the principal has the right to control the details, manner, or method of the individual's work. Sec. 31.3121(d)-1(c)(2), Employment Tax Regs. In contrast, an independent contractor is hired to accomplish a specific result, and the principal has the right only to specify the result it desires. Id. It is not necessary for the principal to actually exercise control; it is sufficient if the principal has the right to control. Weber v. Commissioner, supra at 387; Potter v. Commissioner, T.C. Memo. 1994-356. The employer need not stand over the individual and direct every detail of the individual's work. Weber v. Commissioner, supra at 388.

Petitioner maintains that Ohio State law prohibits DHN from exercising control over him in matters relating to patient care and treatment. See Ohio Rev. Code Ann. sec. 1785.03 (LexisNexis 2004). DHN did not control or supervise petitioner's medical

judgment, including patient diagnoses, what medications to prescribe, or what treatments or procedures to perform. Petitioner had discretion to schedule the length of his patient appointments, to consult with physicians outside of DHN, and to determine whether to continue to treat a patient. Petitioner also maintained the ability to choose outside pathologists, laboratories, and other medical services and to choose the hospitals or surgical centers where he would maintain hospital privileges. Petitioner also chose the hospital personnel to assist him, but neither petitioner nor DHN paid the hospital staff.

The degree of control necessary to find employee status varies with the nature of the services the worker provides. See Ewens & Miller, Inc. v. Commissioner, supra at 270; Youngs v. Commissioner, T.C. Memo. 1995-94, affd. without published opinion 98 F.3d 1348 (9th Cir. 1996). The threshold level of control necessary to find employee status is lower when applied to professional services than when applied to nonprofessional services. Profl. & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 234 (1987), affd. 862 F.2d 751 (9th Cir. 1988); James v. Commissioner, 25 T.C. 1296, 1301 (1956). An alleged employer's control over professional services "must necessarily be more tenuous and general than the control over nonprofessional employees." James v. Commissioner, supra at 1301.

We do not agree that petitioner was not subject to DHN's control. Petitioner was required to work 4-1/2 days during office hours DHN set. Although petitioner chose his half-day off, he did not have the flexibility in his schedule that is indicative of an independent contractor. The employment agreement provided that petitioner would render medical services "under the supervision of the physician members" of DHN. Petitioner agreed that all patients belonged to DHN and was required to submit patient records to DHN for billing and insurance purposes. Petitioner did not provide medical services outside of his relationship with DHN.

Although petitioner exercised his medical judgment when rendering medical services, his methods were directed by professional standards set by the medical community. Because of the lower measure of control applicable to professionals, the fact that DHN did not control his patient diagnoses and treatments does not preclude a finding that DHN exercised sufficient control over petitioner to establish an employment relationship. See James v. Commissioner, supra; Chaplin v. Commissioner, T.C. Memo. 2007-58. We find that DHN had a right of control over petitioner sufficient to find an employment relationship.

B.    Investment in Facilities

The fact that a worker provides his own equipment indicates independent contractor status.  Ewens & Miller, Inc. v. Commissioner, 117 T.C. at 271.  Petitioner provided medical services only at offices DHN leased and at hospitals or surgical facilities where he had staff privileges.  The employment agreement provided that DHN would pay for petitioner's hospital staff dues.  Petitioner did not provide medical services outside of facilities provided or paid for by DHN.  DHN also provided clerical, central billing, and purchasing staff.

Petitioner testified that he provided some specialized equipment that he used to treat patients.  However, DHN also leased medical, communications, and computer equipment and other fixtures for use in its office locations.  Similarly, the hospitals and medical centers where petitioner performed procedures provided necessary equipment.  Petitioner did not quantify his investment in equipment relative to DHN's.  Any investment by petitioner is offset by DHN's investment in office locations and equipment and payment of hospital dues.  Moreover, petitioner did not use the equipment to provide medical services for a fee outside of his relationship with DHN.  This factor supports employment status.

C.    Opportunity for Profit or Loss

An opportunity for profit or loss indicates nonemployee status.  Simpson v. Commissioner, 64 T.C. 974, 988 (1975).  On the other hand, earning an hourly wage or fixed salary indicates an employer-employee relationship exists.  Kumpel v. Commissioner, T.C. Memo. 2003-265.

Pursuant to the employment agreement, petitioner agreed that DHN was entitled to any fees arising from his medical services.  The employment agreement guaranteed petitioner a base salary regardless of the number of patients he saw or the amount of medical fees he generated.  There was no requirement to generate a certain level of patient fees to receive a bonus or an increase in base salary.  Rather, petitioner received bonuses based on the annual net profits of DHN and not on the amount of medical fees he personally generated.  The employment agreement provided that each shareholder physician would receive the same amount of total annual compensation.  If petitioner increased the amount of medical fees he generated, the increase would be shared equally by all the doctors at DHN.  His opportunity for profit was as a shareholder of DHN rather than from rendering medical services.  Further, petitioner did not perform any medical services for a fee outside of his relationship with DHN where he could have an opportunity for profit.

Petitioner had some risk of loss as a shareholder of DHN if DHN operated at a loss. The fact that petitioner incurred an individual loss on the settlement was a business decision he made, but it supports a finding that he held a risk of loss. Therefore, this factor on the whole favors independent contractor status.

D.    Right To Terminate the Relationship

In determining employment status, courts consider the manner in which the relationship can be terminated; i.e., by one or both parties, at any time, with or without notice. Ewens & Miller, Inc. v. Commissioner, supra at 273. The right to discharge a worker, and the worker's right to quit, at any time indicate employee status.

Under the terms of the shareholder and employment agreements DHN had the right to discharge petitioner by vote of all except one of the shareholders with or without cause and without notice. Upon termination, DHN would be required to pay petitioner a "wage continuation payment" of $120,000 for his prior services to DHN. Similarly, petitioner could terminate his relationship with DHN with or without cause although he was required to give 60 days' notice of his resignation. A unilateral notice requirement on the part of the worker does not support independent contractor status. Chaplin v. Commissioner, supra (notice requirement did

not indicate employee status).  But see <u>Levine v. Commissioner</u>,
T.C. Memo. 2005-86 (notice by alleged employer supports
independent contractor status).

Petitioner's right to receive a wage continuation payment
upon termination is at best a neutral factor.  The employment
agreement provided that the payment would be for past services.
It would not constitute a payment for breach of contract or
petitioner's right to perform future services under the contract.
Both parties to the employment agreement had the right to
terminate the relationship with or without cause, and DHN could
terminate the relationshipwithout notice.  This factor supports a
finding of employment status.

E.   <u>Integral Part of Regular Business</u>

Integration of a worker's services into the business operations
of the alleged employer indicates employee status.  DHN is in the
business of providing medical services.  Petitioner, as a
physician member, is integrally involved in that business.  This
factor supports a finding that petitioner was an employee of DHN.

F.   <u>Permanency of Relationship</u>

A continuing relationship indicates an employment relationship
while a transitory relationship weighs in favor of independent
contractor status.  <u>Ewens & Miller, Inc. v. Commissioner</u>, <u>supra</u>
at 273.  The parties' contemplation of a continuing relationship
indicates an employment relationship.  <u>Ellison v. Commissioner</u>,

55 T.C. 142, 155 (1970). In contrast, a relationship established to accomplish a specified objective is indicative of an independent contractor relationship. Id.

In his pretrial memorandum petitioner acknowledged that the doctors at DHN intended a long-lasting relationship but argues this fact is not significant. Petitioner had a long-term relationship with DHN. He joined DHN as a shareholder in 1999. The employment agreement contemplated an initial 3-year term with automatic 1-year renewals thereafter. Given the continuing nature of the relationship, this factor supports a finding of employee status.

G.   Intent of the Parties

The parties clearly intended to create an employment relationship. The employment agreement expressly identified petitioner as an employee of DHN. DHN reported petitioner's compensation on Form W-2 and withheld income, Social Security, and Medicare taxes consistent with this expressed intent. Petitioner did not make quarterly estimated tax payments. For the years 2001 through 2003 DHN similarly reported petitioner's compensation on Forms W-2 and withheld taxes. For these years petitioner reported his compensation from DHN as wages on line 7 of his Forms 1040 and did not report the income or his expenses on Schedule C as he did for 2004.

DHN provided employment benefits to petitioner, including paid vacation and holidays, medical and disability insurance, participation in a retirement plan, and malpractice insurance. DHN also agreed to reimburse petitioner for the cost of continuing education classes. Petitioner did not include in gross income DHN's contributions to his retirement account. DHN refused to issue an amended Form W-2 to petitioner to indicate that he was a statutory employee. This factor supports a finding of an employment relationship.

H.  Conclusion

We find that petitioner is a common law employee of DHN. Petitioner entered into a contract with DHN that expressly identified him as an employee. Consistent with that intent, petitioner received a fixed salary without regard to the medical fees he generated, received paid vacations, employee benefits, and reimbursement for expenses, participated in an employee retirement plan, and received Forms W-2 reporting his compensation. Petitioner was required to work normal office hours, maintained a long-term relationship with DHN, and did not perform medical services for a fee except for his DHN patients. DHN provided his office space, paid for hospital staff privileges, and provided a substantial portion of his medical equipment. Petitioner accepted his employee classification with DHN for prior years as defined in the employment agreement but

sought to change that treatment once faced with the enormous expense from the employment-related lawsuit and settlement in 2004 and 2005. The fact that petitioner was a medical professional with discretion to exercise his professional judgment in patient care and treatment does not negate the strong evidence that shows that he was a common law employee of DHN.

As a common law employee, petitioner must report his compensation from DHN on Form 1040, line 7 and is not entitled to deduct the claimed business expenses on Schedule C. He must claim the expenses on Schedule A as unreimbursed employee business expenses subject to the 2-percent limitation for miscellaneous itemized expenses.

## II. Miscellaneous Itemized Deduction

We find that petitioner has substantiated that he paid legal fees of $22,155 and professional dues of $440 during 2004. Petitioner is entitled to deduct these expenses incurred in connection with his employment as itemized deductions subject to the 2-percent limitation of section 67(a). However, the 2-percent limitation denies any deduction of these expenses for 2004.

To reflect the foregoing,

Decision will be entered

for respondent.